**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

**TRUCKING ASSOCIATION OF NEW YORK,**

*Plaintiff,*

-against-

Case: 1:24-cv-4111

**METROPOLITAN TRANSPORTATION AUTHORITY,**
**TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,**
and **LETITIA JAMES,** in her capacity as Attorney General
for the **STATE OF NEW YORK**

*Defendants.*

_____

**MEMORANDUM OF LAW**
**IN SUPPORT OF TRUCKING ASSOCIATION OF NEW YORK'S**
**MOTION FOR PRELIMINARY INJUNCTION**

_____

MONACO COOPER LAMME & CARR, PLLC
Attorneys for Trucking Association of New York
Brian D. Carr, Esq.
Bar Roll No. BC2323
Jonathan E. Hansen, Esq.
Bar Roll No. JH1129
1881 Western Avenue, Suite 200
Albany, New York 12203
Email: bcarr@mclclaw.com
          jhansen@mclclaw.com

Dated: May 30, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

ARGUMENT .................................................................................................. 8

    LEGAL STANDARD ............................................................................ 8

    POINT I

        TANY HAS STANDING TO SUE AND CHALLENGE
        THE VALIDITY OF THE TOLLING PROGRAM ....................... 9

            A)    TANY's Members Have Article III Standing ......................... 10

            B)    TANY's Members Have Prudential Standing ......................... 11

            C)    TANY Has Associational Standing on Behalf of
                   its Members ......................................................................... 12

    POINT II

        TANY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE
        THE TOLLING PROGRAM VIOLATES THE COMMERCE
        CLAUSE AND IS THEREFORE UNCONSTITUTIONAL ........ 14

            A)    The Charges to TANY Trucks Under the Tolling
                   Program Are Not Based on a Fair Approximation
                   of Their Use ......................................................................... 15

            B)    The Tolling Program Charges to TANY Trucks are
                   Excessive in Relation to the Benefits Conferred
                   Upon Them ......................................................................... 19

            C)    The Tolling Program Need Not Discriminate Against
                   Interstate Commerce to Nonetheless Violate the
                   Commerce Clause ............................................................... 21

            D)    A Commerce Clause Claim is Properly Brought
                   Pursuant to 42 U.S.C. § 1983 ............................................ 21

POINT III

      TANY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE
      THE TOLLING PROGRAM VIOLATES TANY MEMBERS'
      RIGHT TO TRAVEL AND IS THEREFORE
      UNCONSTITUTIONAL ..................................................................................22

POINT IV

      TANY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE
      THE TOLLING PROGRAM IS PREEMPTED BY THE
      FEDERAL AVIATION ADMINISTRATION
      AUTHORIZATION ACT OF 1994 ..................................................................23

POINT V

      THE OTHER PRELIMINARY INJUNCTION FACTORS ARE
      SATISFIED BECAUSE TANY HAS ESTABLISHED
      LIKELIHOOD OF SUCCESS ON THE MERITS........................................25

CONCLUSION ........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

American Trucking Assoc. v. Alviti,
  630 F. Supp.3d 357 (D.RI. 2022) ...................................................................................14, 15, 18

Attorney Gen. of New York v. Soto-Lopez,
  476 U.S. 898 (1986) ......................................................................................................................22

Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,
  567 F.3d 79 (2d Cir. 2009) ....................................................................................................passim

Bruns v. Mayhew,
  750 F.3d 61 (1st Cir. 2014) ...........................................................................................................8

Crosby v. Nat'l Foreign Trade Council,
  530 U.S. 363 (2000) .....................................................................................................................23

Deide v. Day,
  676 F.Supp.3d 196 (S.D.N.Y. 2023) ...............................................................................8, 25, 26

Dennis v. Higgins,
  498 U.S. 439 (1991) .....................................................................................................................21

Dunn v. Blumstein,
  405 U.S. 330 (1972) .....................................................................................................................22

Friends of the Earth v. Laidlaw Envt'l Servs. (TOC), Inc.,
  528 U.S. 167 (2000) ..........................................................................................................10, 12, 13

GMC v. Tracy,
  519 U.S. 278 (1997) .....................................................................................................................14

Grand River Enter. Six Nations, Ltd. v. Pryor,
  481 F.3d 60 (2d Cir. 2007) ..........................................................................................................25

Hunt v. Washington State Apple Advertising Comm'n,
  432 U.S. 333 (1977) .....................................................................................................................10

Industria Y Distribution de Alimentos v. Suarez & Co.,
  797 F.3d 141 (1st Cir. 2015)........................................................................................................18

JTH Tax, LLC v. Agnant,
  62 F.4th 658 (2d Cir. 2023) ...........................................................................................................8

Kloppel v. Sears Holding Corp.,
  2018 U.S. Dist. LEXIS 33606 (W.D.N.Y. Feb. 28, 2018)........................................................23

Melendres v. Arpaio,
  695 F.3d 990 (9th Cir. 2002) ...................................................................................................9, 26

Monell v. Dep't of Soc. Servs.,
    436 U.S. 658 (1978) ..........................................................................................21

Nat'l Private Truck Council v. Okla. Tax Comm'n,
    515 U.S. 582 (1995) ......................................................................................21-22

Northwest Airlines, Inc. v. Cty. of Kent,
    510 U.S. 355 (1994) ..........................................................................................14

NYS Motor Truck Ass'n v. Pataki,
    2004 U.S. Dist. LEXIS 25519 (S.D.N.Y. Dec. 16, 2004) ...............................23

Rowe v. N.H. Motor Transp. Ass'n,
    552 U.S. 364 (2008) ..........................................................................................23

Sammartano v. First Judicial District Court,
    303 F.3d 959 (9th Cir. 2002) .............................................................................9

Selevan v. New York Thruway Auth.,
    711 F.3d 253 (2d Cir. 2012) .......................................................................passim

Statharos v. N.Y. City Taxi & Limousine Comm'n,
    198 F.3d 317 (2d Cir. 1999) .............................................................................25

Susan B. Anthony List v. Driehaus,
    573 U.S. 149 (2014) ..........................................................................................10

U.S. Chamber of Commerce v. Edmondson,
    594 F.3d 742 (10th Cir. 2010) ..........................................................................26

Warth v. Seldin,
    422 U.S. 490 (1975) ..........................................................................................11

Winter v. NRDC, Inc.,
    555 U.S. 7 (2008) ...............................................................................................8

## Statutes and Other Authorities:

U.S Const. Art. I, § 8, Cl. 3.................................................................................14

42 U.S.C. § 1983 ...........................................................................................21, 22

49 U.S.C. § 14501(c)(1) ....................................................................................23

Fed. R. Civ. P. 65(a)............................................................................................1

## PRELIMINARY STATEMENT

Plaintiff, Trucking Association of New York ("TANY" or "Association"), submits this Memorandum of Law in support of its motion for a preliminary injunction pursuant to FRCP 65(a), preventing defendants, Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), from implementing the Central Business District Tolling Program ("Tolling Program"), because it unconstitutionally targets and penalizes the trucking industry (hereinafter referred to as "TANY trucks" or "delivery trucks").

As discussed in detail below, the Tolling Program is unconstitutional for three reasons. First, the Tolling Program violates the Commerce Clause of the United States Constitution because its charges are not a fair approximation of use by TANY members and are excessive in relation to the benefit conferred upon TANY members. Second, the Tolling Program violates TANY members' constitutionally protected right to travel for the same reasons – because it fails to satisfy the fair approximation and excessiveness tests. Third, the Tolling Program violates the Supremacy Clause because it is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), in that it relates to the rates, routes, or services of TANY's membership, which is comprised of motor carriers doing business in New York State.

Where, as here, a plaintiff seeks a preliminary injunction to prevent the implementation of an unconstitutional law, likelihood of success on the merits is the singular dipositive issue. As discussed below, TANY has established herein, and through the accompanying Declarations of TANY's President and TANY members, a strong likelihood that the Tolling Program is unconstitutional. Thus, a preliminary injunction preventing the Tolling Program from being implemented is warranted.

## **STATEMENT OF FACTS**[1]

TANY is a not-for-profit trade association dedicated to representing the interests of the trucking industry in New York, with the efficient and safe movement of freight being the top priority for the Association.  TANY's membership is comprised of a wide array of motor carrier companies with a business presence in New York State, ranging from single truck owner-operators to large national fleets.  Membership in the Association also includes companies that service the motor carrier, trucking, and freight industries.  Most of TANY's members are small- to mid-sized family owned and operated fleets.

The critical importance of New York's trucking industry cannot be overstated. In New York, there are approximately 46,000 trucking companies in operation, with the majority being small, locally owned businesses utilizing fewer than 20 trucks. These small enterprises play a crucial role in the state's economy, representing one out of every 28 jobs. Nearly 90 percent of New York communities rely exclusively on trucks to transport their goods, and over 96 percent of all manufactured products are shipped by trucks.

Furthermore, more than two million businesses across New York State, regardless of their size, depend on efficient goods transportation for their factories, stores, and customers. As set forth in more detail below, the state's trucking industry is particularly critical to the economic vitality and success of the New York City metro region, and, as relevant here, lower Manhattan.

The trucking industry is appropriately heavily regulated, but it is also heavily taxed. TANY members abide by federal and New York State labor and wage laws that are unique to the freight industry and pay a host of additional charges and taxes imposed upon their operations in New York. The trucking industry in New York paid approximately $979 million in federal and state roadway taxes

---

[1] All facts hereunder are obtained from the Declaration of TANY President, Kendra Hems, accompanying these papers.

in 2023. This represents 29 percent of all taxes owed by New York motorists despite trucks representing only 7 percent of all vehicle miles traveled in the state. To break this down to a per truck basis, a typical tractor trailer combination in New York pays $23,680 in state and federal highway user fees, over $13,000 of which (i.e., more than half) is attributable to New York registration fees and fuel tax. These taxes are over and above the typical taxes paid by businesses in New York.  Commercial vehicles are charged a Highway Use Tax, exclusive to commercial vehicles, for every mile traveled in New York State, including in Manhattan.

Specific to operating in Manhattan, commercial vehicles are subject to the Commercial Motor Vehicle Tax as well as significant parking fines resulting from a lack of enforcement in loading zones and a lack of commercial parking space throughout Manhattan. TANY members are further faced with bridge and tunnel tolls of between $87.50 and $115 simply to enter Manhattan depending on the time of day and whether E-ZPass is used.

As such, TANY trucks are already over-burdened and are now being confronted with the imminent implementation of an outrageous and unconstitutional toll on the trucking industry.

In November 2023, the Traffic Mobility Review Board ("TMRB") published its final report to MTA and TBTA regarding the structure of the Tolling Program (hereinafter "TMRB Report").[2] Per this report, the TMRB was tasked by New York State to make recommendations to TBTA regarding toll rates, credits, discounts, and exemptions for the implementation of the Tolling Program.

The TMRB Report made the following recommendations, which were subsequently approved by MTA and TBTA:

---

[2] The TMRB Report can be found online at: 127761 (mta.info).

a)      Passenger vehicles should be charged a $15 toll for entering below 60th Street in Manhattan ("Central Business District" or "Zone"), no more than once per day;

b)      Trucks should be charged a $24 or $36 toll (depending on size) each and every time they enter the Zone;

c)      Toll rates should be 75% lower after 9:00 pm;

d)      For-Hire Vehicles (such as Uber and Lyft), along with New York City Taxis, are fully exempt from the Tolling Program.[3]

The TMRB Report noted that the Tolling Program must reduce congestion in the Zone and generate $1 Billion in net annual revenue to fund $15 Billion for capital projects for transit and commuter rail improvements.  According to statistics contained in the TMRB Report, trucks make up only 4% of all vehicle traffic in the Zone, while For-Hire Vehicles and Taxis (both exempted classes of vehicles) make up a majority of traffic in the Zone, at 52%.

The TMRB Report speculated that charging lower rates during overnight hours may help to incentivize truck drivers to shift their hours of travel into the Zone to less congested times.  The TMRB Report stated that the charges for trucks were based, in part, on the need to encourage the "optimization of deliveries" to reduce trucks' contribution to congestion in the Zone.

MTA has reported that 80% of the profit from the Tolling Program will be used to improve New York City Transit (subways and buses), 10% will be allocated to the Long Island Railroad, and 10% will be allocated to Metro-North Railroad.

---

[3] Instead of paying a $15 toll for entering the Zone, taxis and For-Hire Vehicles will charge their customers a nominal surcharge of $1.25 or $2.50 per trip to, from, within or through the Central Business District. These classes of vehicles will not be charged a toll for entry into the Zone and, thus, are exempt from the Tolling Program. This alternative was not offered to TANY trucks.

TANY has continuously advocated against the Tolling Program on behalf of its members, offering alternatives to MTA, TBTA, and TMRB to ensure an equitable implementation of the Tolling Program. TANY has advocated for an exemption of the supply chain industries from the Tolling Program; pricing parity between trucks and passenger vehicles; or at the very least a once-per-day charge to trucks entering the Zone, similar to that afforded to passenger vehicles, or any combination of these alternatives. MTA and TBTA failed to include any of TANY's proposals in the Tolling Program implementation plan and have instead proceeded to ensure that the Tolling Program disproportionally targets TANY Members.

Hundreds of millions of tons of freight are moved into or out of New York City each year. The top three zip codes for daily freight deliveries and shipments are located in midtown Manhattan next to the Lincoln Tunnel. That freight includes medical supplies, clothing, food, water, school supplies, hospitality supplies, home and commercial heating oil, and more essential goods. Trucks and other commercial vehicles deliver nearly all of that freight. TANY anticipates that the amount of freight tonnage moved into or out of Manhattan each year by its members will substantially increase over the next twenty (20) years. Freight tonnage is projected to grow by 68 percent by 2045 in New York City. Vitally important service industries, like moving, plumbing, electrical, and general maintenance services, rely on the trucking industry.

On a given day, many of the trucks delivering this essential freight travel into and throughout the Zone, and will be forced to subsequently reenter the Zone multiple times per day, to abide by their customers' strict delivery instructions. TANY members have no alternative means of operating their businesses and making deliveries in Manhattan other than to subject their fleets to charges imposed by the Tolling Program.

Each facet of the Tolling Program adversely targets TANY members, from the boundaries of the Zone, to the pricing disparity among motor vehicles, even down to the frequency of Tolling

Program charges imposed upon TANY members. The Tolling Program is designed such that trucks will be charged per entry into the Zone, with no exceptions.

MTA and TBTA tout the Tolling Program's off-peak pricing as a concession to the freight industry. However, this "concession" provides virtually no benefit to TANY members. The Tolling Program's off-peak pricing model purports to charge a reduced toll price to commercial vehicles while keeping in place multiple charges per entry (and re-entry) into the Zone. In reality, the off-peak pricing model is largely unusable for the freight industry due to factors beyond the industry's control.

TANY has been a long-time supporter of New York City's Off Hours Delivery Program, which provides financial incentives to those businesses that are able to implement it. However, the industry must make their deliveries in the Zone based upon customer requirements and logistical constraints which do not permit a switch to off-peak hours, as MTA and TBTA have simplistically asserted. For example, customers in the Zone operate under strict freight elevator rules and typically employ a unionized workforce, making any shift to deliveries during off-peak hours impossible. Residential buildings restrict daily delivery access to between 8:30 AM and 4:00 PM, construction sites do not operate during overnight hours, and few businesses will accept deliveries overnight.

An additional consideration arises in the event that some of a motor carrier's customers elect to take advantage of the Off Hours Delivery funding, but not all of their customers make the switch. Under that scenario, the result would likely be <u>additional</u> truck trips. Whereas now that carrier can route a single truck throughout the course of the day, if not all of the carrier's customers take advantage of the Off Hour Delivery Program, the carrier would then likely need one truck for daytime deliveries, and a second truck for nighttime deliveries. Alternatively, if only one of a motor carrier's customers is able to switch to Off Hours Delivery, the carrier may be forced to alter its services and not deliver to that customer at all, as it may not be feasible to send a truck in overnight to service one location.

Similarly, the Tolling Program's off-peak pricing "concession" will have little to no effect on TANY members' delivery schedules.

TANY members already strive to complete their deliveries in an efficient and cost-effective manner.  A truck located north of the Zone on the East Side of Manhattan and heading to Queens or Brooklyn will use the Queensboro Bridge as the most efficient crossing. Access to the Queensboro Bridge is on either 59th Street or 58th Street, both of which are located in the Zone.  This means that a truck heading from the East Side of Manhattan to Queens or Brooklyn will be charged under the Tolling Program for simply accessing either the 59th Street or 58th Street entrance to the Queensboro Bridge.

Similarly, a truck located north of the Zone, heading south on the West Side of Manhattan, will be charged under the Tolling Program to simply access Route 9A (which is exempt from the congestion pricing toll) at 59th Street as trucks are prohibited on 9A north of 59th Street.

These examples illustrate the most efficient routes available to trucks operating in Manhattan to minimize time, vehicles traveled, and fuel use. Yet, despite already employing the most efficient routes under these examples, TANY members will be left with no choice but to incur charges under the Tolling Program. Traveling north to cross the George Washington Bridge to avoid one of the multiple per-day charges under the Tolling Program will require TANY members to operate their trucks for increased lengths of time and distance, shifting traffic to other burdened areas of New York City, burning more fuel, and creating more unwanted emissions, and potentially creating difficulties complying with Federally mandated hours-of-service requirements.

The trucking industry and truck operators support every segment of the economy in Manhattan.  MTA and TBTA expect TANY members to pass along the cost of the new toll to their customers.  Customers in the Zone, like restaurants, hospitals, and schools, frequently receive multiple deliveries per day.  It is conceivable that one customer in the Zone will absorb Tolling Program charges

four (4) separate times in one day.  For example, one trucking company may deliver produce, a second trucking company may deliver meat, a third trucking company may deliver beverages, and a fourth trucking company may deliver linens to a single business.  These additional charges, compounded, will have a significant economic effect on the tens of thousands of businesses located in the Zone, especially the vast number of small grocers and eateries that rely on the trucking industry to operate their businesses.

Implementation of the Tolling Program disproportionately targets TANY members with both the intention and the anticipated effect of changing their routes, rates and services.  As such, TANY urges the Court to grant its motion for preliminary injunction against the implementation of the Tolling Program.

## ARGUMENT

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008); *see also* ITH Tax, LLC v. Agnant, 62 F.4th 658, 667 (2d Cir. 2023).  Courts have held that the first two factors – likelihood of success on the merits and likelihood to suffer irreparable harm – are the most important.  *See* Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014).

Where, as here, a violation of a constitutional right is alleged, the first two prongs "merge into one", because a violation of a constitutional right constitutes irreparable harm in and of itself.  *See* Deide v. Day, 676 F.Supp.3d 196, 232 (S.D.N.Y. 2023).

Similarly, on a motion for a preliminary injunction to prevent the implementation of an unconstitutional state law, demonstrating likelihood of success on the merits satisfies the final two factors, because implementing a likely unconstitutional law is neither equitable nor in the public

interest.  *See* Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2002) ("it is always in the public interest to prevent the violation of a party's constitutional rights") *quoting* Sammartano v. First Judicial District Court, 303 F.3d 959 (9th Cir. 2002).

While all four factors are discussed below for the sake of completeness, here, likelihood of success on the merits is the sole dispositive issue.  TANY establishes herein, and through the accompanying Declarations of TANY members, that the Tolling Program is unconstitutional.  Thus, TANY is entitled to a preliminary injunction preventing the Tolling Program from being implemented.

<u>**POINT I**</u>

**TANY HAS STANDING TO SUE AND CHALLENGE
THE VALIDITY OF THE TOLLING PROGRAM**

As a preliminary matter, TANY has standing to sue. As explained below, TANY's members include numerous motor carriers directly affected by the Tolling Program. The Tolling Program targets the trucking industry by charging trucks for each and every trip into the Zone, while charges to passenger vehicles are capped at once per day.

This scheme is especially egregious because, according to data published by MTA, trucks make up <u>only 4%</u> of the total vehicles entering the Zone.  Meanwhile, Vehicles For Hire (such as ridesharing with Uber and Lyft) and New York City Taxis are fully exempt from the Tolling Program, despite MTA's own data showing that these exempt classes of vehicles make up a majority (52%) of all traffic in the Zone.

In other words, defendants' own data demonstrates that trucks are not a significant cause of congestion in the Zone, yet they bear a disproportionately large percentage of the burden while other vehicle classes making up more than half of all traffic in the Zone are fully exempt.

Further, one of the mandates of the Tolling Program is to reduce traffic in the Zone by encouraging the use of public transit. However, delivery trucks cannot take advantage of this option.

Rather, they have no choice but to enter the Zone to make their deliveries, sometimes forced to do so multiple times per day to meet their customers' needs.

Although the express stated purpose of the Tolling Program is to interfere with the routes trucks would otherwise use, and the services that they would otherwise provide, charging trucks exponentially more than passenger vehicles for entering the Zone does nothing to address congestion. That is because trucks are not the primary cause of congestion in the Zone to begin with, and because trucks have no choice but to enter the Zone to make their deliveries. Thus, there can be, and in fact is, no legitimate reason for how the tolling scheme is structured. Therefore, the Tolling Program does not pass constitutional muster.

As set forth hereunder, TANY's members have both Article III standing and prudential standing to challenge the validity of the Tolling Program, and TANY has associational standing to assert these constitutional challenges on behalf of its members.

### A) TANY's Members Have Article III Standing.

To establish Article III standing, a plaintiff must demonstrate an "injury in fact" which is actual or imminent, as opposed to conjectural or hypothetical, and that such injury is fairly traceable to the challenged action of the defendants. *See* Friends of the Earth, *supra*, at 180-81 *citing* Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). Further, it must be shown that the injury is likely to be redressed by a favorable decision. Id. Future injury is sufficient to establish standing if "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014).

Here, as demonstrated in the accompanying Declarations, TANY's membership is comprised of a wide array of motor carriers with a business presence in New York State, ranging from single truck owner-operators to large national fleets. TANY's members travel into the Zone on a regular basis and thus will suffer actual harm once the Tolling Program goes into effect. This injury is

imminent, as defendants have publicly announced the intention to begin implementing the Tolling Program on June 30, 2024. Moreover, the nature of the harm is "certainly impending", as opposed to speculative, because the tolling scheme – which forces the trucking industry to bear *by far* the biggest burden in relation to its use – has already been completely laid out and approved by the defendants. TANY's members will be charged these unconstitutional tolls beginning on June 30th.

This harm is more than "fairly traceable" to the challenged action of the defendants – indeed, it is directly caused by the defendants' imminent implementation of the Tolling Program.  Moreover, a favorable decision will redress the harm to TANY's members because it would prevent the implementation of the Tolling Program which would, in turn, prevent TANY's members from facing the exorbitant charges the Tolling Program imposes on the trucking industry.

As such, because all of the elements of Article III standing are met here, TANY's members have standing to challenge the validity of the Tolling Program.

**B) TANY's Members Have Prudential Standing.**

In addition to Article III standing, TANY's members have prudential standing to challenge the validity of the Tolling Program.

To establish prudential standing, a plaintiff must demonstrate a legal right or interest in the relief sought. *See* Warth v. Seldin, 422 U.S. 490, 509 (1975). In the context of constitutional claims such as this one, prudential standing is sometimes determined by the "zone of interest" test. For instance, in another case involving a Commerce Clause claim, the Second Circuit held that because the plaintiff operated an interstate business, it "thus falls within the zone of interest protected by the Commerce Clause." *See* Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., 567 F.3d 79, 86 (2d Cir. 2009).

TANY's members plainly have a legal right and interest in the relief sought. TANY's members own and operate interstate transportation businesses, placing them squarely within the zone of interest

to bring a Commerce Clause claim relating to a toll on trucks. Id.  Moreover, TANY's members are motor carriers, which place them directly within the zone of interest to bring a preemption claim pursuant to FAAAA, which prohibits state laws that relate to the rates, routes, or services of motor carriers.

As such, TANY's members have prudential standing to challenge the validity of the Tolling Program.

**C) TANY Has Associational Standing on Behalf of its Members.**

The final step of establishing standing in this case is for TANY to demonstrate that it has associational standing to challenge the validity of the Tolling Program on behalf of its members. TANY meets this requirement.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

The first prong is met by reference to subpoints I(A) and I(B), above, which demonstrate that TANY's members would have standing to sue in their own right.

The second prong is also met, because the interests at stake are germane to TANY's purpose. See Friends of the Earth, supra.  As set forth in detail in the accompanying Declaration of TANY President Kendra Hems, TANY's membership is comprised of a wide array of motor carrier companies with a business presence in New York State, ranging from single truck owner-operators to large national fleets. TANY is dedicated to representing the interests of the trucking industry in New York State, with the efficient and safe movement of freight being the top priority. TANY has

advocated for the interests of its members with respect to the Tolling Program throughout the Program's inception and development.

The goal of TANY in challenging the validity of the Tolling Program is the same as its members – to ensure that the trucking industry is not wrongfully targeted by a tolling scheme that seeks to place an unconstitutional burden on delivery trucks for the sake of generating revenue for buses, subways, and railroads, which the trucking industry cannot utilize. As such, it is plain that the interests at stake are germane to TANY's purpose.

The last prong of the associational standing test is also met here, because neither the claims asserted, nor the relief requested requires the participation of individual members of the association. *See* Friends of the Earth, *supra*.

Here, TANY is not presently seeking monetary relief or any other relief specific to any one or more of its members. Similarly, the claims being advanced by TANY do not require the peculiar perspective of any one or more of its members to prove. Rather, TANY seeks to prevent the implementation of the Tolling Program on the basis that it is unconstitutional by the manner in which the Program targets and penalizes the trucking industry as a whole.

While numerous TANY's members will be imminently harmed by this tolling scheme, this harm is shared by all motor carriers that must travel into the Zone to make deliveries. Thus, the interests of these motor carriers can be fully and adequately represented by TANY on behalf of its members.

Based on the foregoing, TANY has associational standing to challenge the validity of the Tolling Program on behalf of its members.

## POINT II

### TANY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE TOLLING PROGRAM VIOLATES THE COMMERCE CLAUSE AND IS THEREFORE UNCONSTITUTIONAL

The Commerce Clause of the United States Constitution gives Congress the power to regulate Commerce "among the several States." U.S Const. Art. I, Sec. 8, Cl. 3. "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." GMC v. Tracy, 519 U.S. 278, 287 (1997).

A toll must satisfy three requirements to be permissible under the Commerce Clause: (1) it must be a fair approximation of use; (2) it must not be excessive in relation to the benefits conferred; and (3) it must not discriminate against interstate commerce. *See* Selevan v. New York Thruway Auth., 711 F.3d 253, 259 (2d Cir. 2012) *citing* Northwest Airlines, Inc. v. Cty. of Kent, 510 U.S. 355, 369 (1994). If any one of these requirements is not met, the toll is unconstitutional.

As explained below, the Tolling Program fails to satisfy both the "fair approximation and "excessiveness" tests. These two tests "serve distinct purposes." American Trucking Assoc. v. Alviti, 630 F. Supp.3d 357, 377 (D.RI. 2022). The fair approximation test focuses "on the fairness of the method by which the fees are charged", while the excessiveness test examines "the reasonableness of the amount of money generated from" the toll. Id.

Here, the Tolling Program wrongfully targets and penalizes TANY's members. Despite MTA *admitting* that trucks make up only 4% of total vehicles in the Zone, the Tolling Program charges a toll to trucks each time they enter the Zone, while capping the toll on passenger vehicles at once per day. Meanwhile, For-Hire Vehicles (e.g., ridesharing vehicles) and New York City Taxis, which make up 52% of all traffic in the Zone, are fully exempt from the Tolling Program. This is not even close to a fair approximation of use.

Further, the charges on the trucking industry are grossly excessive in relation to the benefits conferred.  Specifically, 80% of the profit from the Tolling Program will go to New York City buses and subways while the final 20% will go to the railroads. Undoubtedly, TANY's members cannot take advantage of New York City's subways, buses, or railroads to make their necessary deliveries to the countless businesses and residences in the greater metropolitan area.

Thus, under the Tolling Program, trucks bear an exponentially large burden in relation to their use, but reap no benefit. The Commerce Clause does not permit this.

**A) The Charges to TANY Trucks Under the Tolling Program Are Not Based on a Fair Approximation of Their Use.**

A toll is constitutional under the Commerce Clause only if "the method by which the fees are charged" is fair.  *See* American Trucking Assoc., *supra* at 377; *see also* Selevan, *supra* at 259.  The "fair approximation" test requires "rational distinctions among different classes of motorists" to ensure that each user is paying a fair share for its use.  Selevan at 260.

In determining whether the Tolling Program passes the fair approximation test, it is instructive to look at two other cases – Selevan, in which it was held that a toll *was* a fair approximation of use, and American Trucking Assoc., in which it was held that a toll *was not* a fair approximation of use – to see how the Tolling Program compares to each.

In Selevan v. New York Thruway Auth., a toll policy which gave a discounted rate to local residents was held to be constitutional under the fair approximation test.  The Grand Island Bridge toll charged a general passenger rate of $1.00 per trip, a commuter rate of 28 cents per trip, and a Grand Island resident rate of 9 cents per trip.  Selevan, *supra*, at 255-56.  Motorists who used the Grand Island Bridge, but who were not Grand Island residents, sued and claimed that the toll was unconstitutional because, among other things, the tolling scheme was not a fair approximation of use.  Id. at 259.

In ultimately concluding that the Grand Island Bridge toll passed the fair approximation test, the Second Circuit noted that the differing rates were "not wholly unreasonable", because Grand Island residents needed to use the Bridge "several times a day" due to the "small size and isolation of Grand Island" and were thus charged the least ($0.09). Id. Commuters had the next greatest need to use the Bridge, and thus were charged at the second lowest rate ($0.28). *See* Id. Lastly, the general passenger rate ($1.00) applied to those with the least need to use the Bridge and, thus, those motorists were least likely to incur multiple charges per day. *See* Id.

In other words, because the tolling policy charged a lesser amount per trip to those motorists who would be forced to incur the toll more often, the court found that the differing rates were not "wholly unreasonable." Id. Thus, the Grand Island Bridge toll passed the fair approximation test and was held to be constitutional. Id.

Here, by contrast, the Tolling Program charges passenger vehicles approximately 50% of what it charges trucks and, most significantly, limits charges on passenger vehicles to only once per day. So, trucks not only have to pay roughly double the rate of passenger vehicles (1.6 to 2.4 times more, depending on the size of the truck), but they also must incur multiple charges daily for every trip into the Zone.

Not only is the Tolling Program inconsistent with the Selevan case, but it actually functions in the exact opposite manner as the Grand Island Bridge toll. Whereas the Grand Island Bridge toll offered a lower rate to those vehicles most likely needing to make multiple trips over the bridge (local residents and commuters), here the unconstitutional Tolling Program penalizes trucks for needing to make multiple trips into the Zone. This is precisely contrary to what was found to be reasonable in Selevan.

It is important to remember that one of the mandates of the Tolling Program is to reduce congestion in the Zone by encouraging drivers to pursue other options, such as using subways and

buses, seeking out alternative routes, or traveling during off-peak times. However, delivery trucks cannot take advantage of any of these other options. It should go without saying that motor carriers cannot utilize subways or buses to make their deliveries.

Additionally, delivery trucks cannot avoid the Zone by changing their routes or delivery times. As shown in the accompanying Declarations of TANY members, trucks frequently must travel into the Zone multiple times daily to meet the needs of their customers. Nonetheless, the Tolling Program penalizes delivery trucks by charging them for each and every trip into the Zone, while passenger vehicles are charged no more than once per day.

The differing rates for the Grand Island Bridge toll were found to be "not wholly unreasonable" precisely because vehicles that needed to use the Bridge more often were charged less per trip. *See* Selevan, *supra.* The Tolling Program does the exact opposite, charging delivery trucks for each and every trip while capping charges on passenger vehicles at once per day. This is despite the fact that delivery trucks have no other options and, thus, by necessity, will need to make more trips into the Zone on a daily basis than passenger vehicles.

Furthermore, because delivery trucks have no way to avoid trips into the Zone, charging them for multiple daily trips into the Zone does nothing to advance the mandate of the Tolling Program, which is to reduce congestion. Meanwhile, For-Hire vehicles and New York City Taxis, which combined make up 52% of all traffic in the Zone, are fully exempt from paying a toll for entering. When viewed through this lens, it is clear that the Tolling Program is nothing more than a cash grab directly from the pockets of TANY's members, who serve a massive and critical role in supplying the majority of the goods relied upon by the residents, businesses, and essential service providers in the Zone and, by extension, sustain the economic vitality of New York City and New York State.

The Tolling Program is completely different from the Grand Island Bridge tolling scheme and, thus, it fails the fair approximation test.

17

In American Trucking Assoc. v. Alviti, a tolling program was held to be unconstitutional under the fair approximation test because it charged only large commercial trucks for using Rhode Island bridges. American Trucking Assoc., *supra*.  In that case, the court noted that "exempting certain users from paying fees is permissible so long as they are not wholly unreasonable and reflect rational distinctions . . . ."  Id. at 386-87.  The court further noted that a toll must "reasonably draw a line between those it is charging and those it is not" to be constitutional.  Id., *quoting* Industria Y Distribution de Alimentos v. Suarez & Co., 797 F.3d 141, 145 (1ˢᵗ Cir. 2015).

In highlighting the fact that large commercial trucks accounted for only 3% of all bridge traffic in Rhode Island, the court in Alviti concluded that it was not a fair approximation of use for trucks to bear the entire cost of the tolling program. 630 F. Supp.3d at 388-89.  Therefore, the Rhode Island truck toll was held to be unconstitutional.

The Tolling Program is very similar to the unconstitutional Rhode Island truck toll in multiple ways.  First, For-Hire Vehicles and New York City Taxis, which combined make up 52% of all traffic in the Zone, are fully exempt under the Tolling Program. When the mandate of the Tolling Program is to reduce congestion, it is "wholly unreasonable" to exempt more than half of all users while forcing a minority of users to bear the entire cost.

Second, trucks make up a mere 4% of all traffic in the Zone, yet commercial trucks and vans are the *only* classes of vehicles which are not exempt from multiple charges per day for entry into the Zone.  *All* passenger and "passenger-like" vehicles are exempt from paying the toll more than once per day.  But trucks, which often have no choice but to enter and re-enter the Zone multiple times per day to support lower Manhattan businesses and meet the delivery needs of those customers, must pay for each and every one of those entries.

To pass the fair approximation test, a toll must "reasonably draw a line between those it is charging and those it is not." *See* Industria Y Distribution de Alimentos, *supra*.  Plainly, the Tolling

Program's exemptions are not aimed at reducing congestion (i.e., the purported goal of the Program), but are rather aimed at maximizing revenue by charging the most money to the class of vehicles that (1) is not the main cause of congestion, and (2) is the least capable of avoiding entry (and re-entry) into the Zone during peak hours.

For these reasons, the Tolling Program violates the Commerce Clause because the charges imposed upon TANY trucks are not a fair approximation of their use.

**B) The Tolling Program Charges to TANY Trucks are Excessive in Relation to the Benefits Conferred Upon Them.**

A toll is unconstitutional under the Commerce Clause if it is excessive in relation to the benefit conferred. *See* Selevan, *supra* at 259. "[T]here need not be a perfect fit between the use of the facilities and the support of those facilities by the fee." Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., 567 F.3d 79, 86 (2d Cir. 2009). However, there must be a "functional relationship" between the two. Id. at 87.

Here, 80% of profits from the Tolling Program will go to New York City subways and buses, while the remaining 20% will go to the railroads. As discussed above (Point II(A)), TANY trucks will be charged exponentially more than other vehicle classes, despite making up only 4% of all traffic in the Zone. Yet, delivery trucks have no way to benefit from improvements to subways, buses, and railroads. Trucks cannot use these forms of public transportation at all to complete their deliveries. The money is being collected from delivery trucks at the highest rate and then allocated elsewhere. This is in stark contrast to a bridge toll, for example, which might charge trucks at a higher rate than cars, but the funds collected then go to the maintenance of the very bridges that the trucks are using each day.

Defendants will likely argue (because they must) that while TANY's members cannot directly benefit from the use of buses, subways, and railroads to make their deliveries, they will indirectly benefit from a reduction in congestion in the Zone. This argument fails for two reasons.

First, as explained above (Point II(A)), the Tolling Program will do very little, if anything, to actually reduce congestion in the Zone, because more than half of all vehicles entering the Zone are fully exempt. Moreover, all passenger vehicles are exempt from multiple charges per day, leaving commercial trucks and vans as the only classes of vehicles actually hit hard by the tolling scheme. Yet, as discussed in detail above, delivery trucks make up only 4% of total traffic in the Zone and have no choice but to enter and re-enter the Zone as required to complete their deliveries to their customers. So, while charging trucks much more aggressively than other classes of vehicles will certainly benefit defendants in terms of the revenue it will generate, it does nothing to advance the Tolling Program's other mandate to reduce congestion. Thus, the argument that the trucking industry will indirectly benefit from the Tolling Program because of reduced congestion in the Zone is a complete fallacy, belied by MTA's own data.

Second, it is settled law in this Circuit that incidental and generalized "quality-of-life improvements cannot be said to confer an actual or potential benefit" to users who are being charged a toll. *See* Bridgeport Ferry, *supra,* at 87.  In Bridgeport Ferry, the State of Connecticut and City of Bridgeport imposed a passenger fee on users of a ferry.  Id. at 82-83.  Part of the revenue from this passenger fee was used for a development project for reducing highway traffic.  Id. at 87.  In ruling that the passenger fee was unconstitutional under the Commerce Clause, the Second Circuit held:

> "No doubt those ferry passengers who drive to or from the Dock along I-95 are grateful for any reduction in traffic, but they would be equally grateful for whatever steps . . . the City of Bridgeport might take to reduce air pollution or otherwise improve the environment along I-95.  Such quality-of-life improvements cannot be said to confer an actual or potential benefit to the ferry passengers as users of the ferries and thus exceed the bounds of what may reasonably serve as the basis for the [] fee."  Id.

20

Here, similarly, TANY trucks driving into the Zone obtain no benefit from improvements made to buses, subways, and railroads. Under the circumstances, there is no "functional relationship" between the tolling scheme – which singles out the trucking industry as the only class of vehicles being charged multiple times per day – and improvements made to buses, subways, and railroads, which the trucking industry cannot take advantage of to complete their necessary deliveries.

As such, the Tolling Program is unconstitutional because the charges to TANY trucks are excessive in relation to the benefit conferred upon them.

**C) The Tolling Program Need Not Discriminate Against Interstate Commerce to Nonetheless Violate the Commerce Clause.**

It should be noted that, although the Commerce Clause is rooted in the protection of interstate commerce, a toll need not discriminate against interstate commerce to violate the Commerce Clause. *See, e.g.*, Bridgeport Ferry, *supra*, at 86. Where, as here, the plaintiff has standing to assert a Commerce Clause claim because it is within the "zone of interest protected by the Commerce Clause", it can establish that a toll violates the Commerce Clause because it fails to satisfy either the fair approximation or excessiveness tests, or both. Id. at 85-86.

Here, TANY has not only established its standing to sue, but also that the Tolling Program fails both the fair approximation and excessiveness tests. Thus, the Tolling Program is unconstitutional under the Commerce Clause of the United States Constitution and defendants must be enjoined from its implementation.

**D) A Commerce Clause Claim is Properly Brought Pursuant to 42 U.S.C. § 1983.**

42 U.S.C. § 1983 "provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 700-01 (1978). The Supreme Court has held that "the Commerce Clause confers 'rights, privileges, or immunities' within the meaning of § 1983." Dennis v. Higgins, 498 U.S. 439, 446 (1991). *See also* Nat'l Private

Truck Council v. Okla. Tax Comm'n, 515 U.S. 582, 585 (1995) (recognizing that "one of the 'rights, privileges or immunities' protected by § 1983 was the right to be free from state action that violates the dormant Commerce Clause").

As such, TANY can properly bring its Commerce Clause claim against defendants pursuant to 42 U.S.C § 1983.

## POINT III

### TANY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE TOLLING PROGRAM VIOLATES TANY MEMBERS' RIGHT TO TRAVEL AND IS THEREFORE UNCONSTITUTIONAL

In addition to violating the Commerce Clause, the Tolling Program also violates the constitutionally protected right to travel. "Freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 901 (1986) *quoting* Dunn v. Blumstein, 405 U.S. 330, 338 (1972). "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." Attorney Gen. of New York, 476 U.S. at 902.

The constitutionally protected right to travel applies equally to both intrastate and interstate commerce. *See* Selevan, *supra*, at 257. When the constitutionality of a toll is at issue, the same three-part test used for evaluating the toll under the Commerce Clause applies to determine whether the right to travel is violated. Id. at 258.

Thus, for all of the same reasons that the Tolling Program violates the Commerce Clause, it also violates TANY members' constitutionally protected right to travel.

## POINT IV

### TANY IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE TOLLING PROGRAM IS PREEMPTED BY THE FEDERAL AVIATION ADMINISTRATION AUTHORIZATION ACT OF 1994

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000). The Supremacy Clause provides Congress with this power. Art. VI, Cl. 2. Pursuant to this power, the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") expressly preempts a state "law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C.S. Sec. 14501(c)(1). In this context, "related to" means "having connection with or reference to." Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 367 (2008).

FAAAA's preemption clause is "broad but not limitless." NYS Motor Truck Ass'n v. Pataki, 2004 U.S. Dist. LEXIS 25519 (S.D.N.Y. Dec. 16, 2004). FAAAA preempts state laws that have a "significant effect" on rates, routes, and services of motor carriers. Id. By contrast, state laws that affect rates, routes, or services in only a "tenuous, remote or peripheral manner" are not preempted. Id.

The legislative intent of FAAAA was to "ensure transportation rates, routes and services" reflected "maximum reliance on competitive market forces . . . ." Kloppel v. Sears Holding Corp., 2018 U.S. Dist. LEXIS 33606 (W.D.N.Y. Feb. 28, 2018). The purpose was "to create a completely level playing field" for motor carriers. NYS Motor Truck Ass'n v. Pataki, 2004 U.S. Dist. LEXIS 25519 (S.D.N.Y. Dec. 16, 2004). Where, as here, a state law "actually interfere(s)" with FAAAA's purpose, it is preempted. Id. The Tolling Program is preempted by FAAAA because its express purpose is to modify the prices, routes, and services of motor carriers.

To begin with, it is important to recognize what makes the Tolling Program different from a typical user fee. Consider a standard bridge toll, for instance. The purpose of that type of ubiquitous tolling mechanism is not to dissuade drivers from using the bridge. Rather, the purpose is to collect a fee from the users of the bridge which can then be used to maintain that bridge in the future.  By contrast, the purpose of the Tolling Program is to reduce congestion in the Zone – in other words, to prevent vehicles from entering -- while concurrently needing to meet its mandate to raise at least $1 Billion in revenue each year.

The Tolling Program has a mandate to reduce congestion, and defendants expressly intend to satisfy this mandate by targeting the trucking industry, in more ways than one. Indeed, defendants have overtly stated in the TRMB Report that charging lower rates during overnight hours may help to incentivize "especially truck drivers" to shift their hours of travel into the Zone to less congested times.

Similarly, the TMRB Report states that the Tolling Program's charges for trucks are based, in part, on the need to encourage the "optimization of deliveries" to reduce trucks' contribution to congestion in the Zone (i.e., to reroute trucks so that they make fewer trips into the Zone).  However, as previously stated, the industry must make their deliveries in the Zone based upon customer requirements.

The purpose of FAAAA is to ensure that motor carrier rates, routes, and services are governed by competitive market forces, and those market forces generally dictate that such services are provided during regular business hours. However, the toll structure is designed with the <u>express intent</u> to alter the routes and services of motor carriers, and to curtail the provision of such services from being offered. This is not permissible under FAAAA.

Defendants have justified the charges to the trucking industry by stating that motor carriers can simply pass along the charges to their customers. Once again, this runs afoul of FAAAA because

it relates to the prices of motor carriers, requiring TANY's members to renegotiate annual rate agreements to facilitate the Tolling Program's mandate of generating $1 Billion in revenue annually.

In addition, the Tolling Program's rate structure singles out motor carriers. More than half of all vehicles traveling into the Zone are fully exempt. Beyond these fully exempt classes, almost every other class of vehicle is exempt from multiple charges per day. It is only commercial trucks and vans that are subject to the most egregious and aggressive tolling by being forced to pay a fee for each and every trip into the Zone per day.

This disparate treatment of motor carriers in comparison to all other classes of vehicles, coupled with the express intent of defendants to alter motor carriers' prices, routes, and services, most certainly interferes with the purpose of FAAAA, which is to ensure the trucking industry can operate on a "completely level playing field" with "maximum reliance on competitive market forces." *See* Kloppel, *supra*.

As such, the Tolling Program is invalid for the separate reason that it is federally preempted.

## POINT V

### THE OTHER PRELIMINARY INJUNCTION FACTORS ARE SATISFIED BECAUSE TANY HAS ESTABLISHED LIKELIHOOD OF SUCCESS ON THE MERITS

To demonstrate irreparable harm, a plaintiff seeking a preliminary injunction must show that it will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007).

"In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." Deide v. Day, 676 F.Supp.3d 196, 232 (S.D.N.Y. 2023) *citing* Statharos v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 322 (2d Cir. 1999). As demonstrated above (Points II-IV), the Tolling Program is likely unconstitutional and preempted by federal law. Thus, TANY has

established its likelihood of success on the merits.  As such, because TANY has demonstrated

likelihood of success on the merits, the requirement to demonstrate irreparable harm is also satisfied.

Id. (where violation of a constitutional right is alleged, the first two prongs "merge into one").

Nonetheless, the injury to TANY members, if the Tolling Program goes into effect as

scheduled on June 30, 2024, will be neither remote nor speculative.  The tolling scheme is already laid

out by MTA, and the mechanisms are in place to begin charging vehicles entering the Zone consistent

with that tolling scheme on June 30, 2024.  As demonstrated in the accompanying Declarations, this

will cause actual and imminent harm to TANY's members.

Moreover, based on the tremendous number of vehicles entering the Zone (enough for MTA

to generate $1 Billion in projected net revenue per year), it is simply not workable to redress this harm

several years in the future at the conclusion of this litigation.  That is why TANY is not seeking

monetary relief herein, and is instead seeking injunctive and declaratory relief, to prevent the

implementation of the Tolling Program.

As such, TANY has demonstrated irreparable harm.

Similarly, the final two factors for preliminary injunction – balance of hardships and public

interest – are interrelated and both strongly favor TANY in this case because of the likelihood that

the Tolling Program is unconstitutional. Indeed, it cannot be a hardship to MTA and TBTA to be

prevented from implementing a regulation that is likely unconstitutional. See U.S. Chamber of

Commerce v. Edmondson, 594 F.3d 742, 771 (10th Cir. 2010).  Moreover, there is no legitimate public

interest that is furthered by the implementation of a likely unconstitutional regulation. See Melendres

v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2002) ("it is always in the public interest to prevent the violation

of a party's constitutional rights").

Therefore, because TANY has established its likelihood of success on the merits, and because this naturally and logically leads to the satisfaction of the other preliminary injunction factors, the application for preliminary injunction should be granted.

## CONCLUSION

Based on the foregoing, it is respectfully requested that TANY's motion for preliminary injunction be granted and that defendants be prevented from implementing the Central Business District Tolling Program.

Dated:  May 30, 2024
       Albany, New York

MONACO COOPER LAMME & CARR, PLLC

By: _____
      Brian D. Carr, Esq.
      Bar Roll No. BC2323
      Jonathan E. Hansen, Esq.
      Bar Roll No. JH1129
      Attorneys for
      Trucking Association of New York
      1881 Western Avenue, Suite 200
      Albany, New York 12203
      Email:  bcarr@mclclaw.com
             jhansen@mclclaw.com

27