

Kaplan Martin LLP
156 West 56th Street, Suite 207
New York, NY 10019

(212) 316-9500
rkaplan@kaplanmartin.com

September 4, 2024

**BY CM/ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl St.
New York, N.Y. 10007

          Re:    *Trucking Ass'n of N.Y. v. Metro. Transp. Auth.*, No. 24 Civ. 4111 (S.D.N.Y.) (LJL)

Dear Judge Liman:

      We write on behalf of the Metropolitan Transportation Authority ("MTA") and the Triborough Bridge and Tunnel Authority ("TBTA," and collectively with the MTA, the "MTA Defendants") pursuant to Your Honor's Order requesting that we submit an outline of our arguments in advance of filing our anticipated motion to dismiss dated July 9, 2024. ECF 47.

**I.  Background**

      This action is based on the objections of the Trucking Association of New York ("TANY") with how the Manhattan Central Business District Tolling Program (the "Program") treats trucks, as compared to other vehicles. Specifically, TANY seeks to enjoin the Program's implementation based on alleged violations of: (1) the dormant commerce clause, ¶¶ 76-85; (2) the constitutional right to travel, ¶¶ 86-92; and (3) the Federal Aviation Administration Act of 1994 ("F4A"), which TANY argues preempts the Program, ¶¶ 93-97.[1]

      Under the toll rate schedule adopted by the TBTA Board, different vehicle classes will be subject to different charges for entering the Manhattan Central Business District ("CBD"). As relevant here, peak-period entry charges for E-ZPass customers will be $7.50 for

---

[1] Citations to "¶ _" are to paragraphs of the Complaint, ECF 14. The Complaint's factual allegations are accepted as true for purposes of a motion to dismiss, but not to the extent that they are contradicted by documents integral to the pleading. *See, e.g., Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020).

motorcycles, $15 for passenger vehicles, $24 for single-unit trucks and buses, and $36 for multi-unit trucks and licensed sightseeing buses. *See* TBTA at 1.[2] As a result, the peak-period toll on multi-unit trucks is approximately 2.4 times greater than the corresponding toll on passenger vehicles. *See id*. That difference between the two tolls is actually far smaller than the ratio for other bridge and tunnel tolls in the metropolitan area, which charge multi-unit trucks as much as eight times more than passenger vehicles are charged. *See* TMRB at 20.[3]

The Complaint falsely alleges that for-hire vehicles and taxis are exempt from the Program entirely. *See* ¶¶ 6, 9, 33, 35. As confirmed by materials properly considered on a motion to dismiss, for-hire vehicles and taxis will be subject to a $1.25 charge on every trip taken to, from, within, or through the CBD, while specific for-hire vehicles dispatched by Lyft or Uber will be subject to a $2.50 per-trip charge. TBTA at 2. This rate structure reflects a practical reality: the $15 charge on passenger vehicles was divided by twelve for taxis and by six for specific for-hire vehicles, representing the daily average number of trips that each type of vehicle takes within the CBD. TMRB at 23.

The Complaint further alleges that trucks will be the only vehicles charged each and every time that they enter the CBD—and implies that all other vehicles will be charged no more than once per day. ¶¶ 7-8. These allegations, too, are not accurate. More specifically, under the adopted toll rate schedule, passenger vehicles and motorcycles are the only vehicle classes entitled to a once-per-day toll cap; all other vehicles entering the CBD will be charged each time they enter. TBTA at 1-2 (setting "[d]aily toll cap of once per day for Class 1 and Class 5 vehicles"). This includes pick-up trucks with modified beds, vans with extended roofs above the windshield, and licensed sightseeing buses, as well as taxis and for-hire vehicles, as discussed above. *Id*.

The Program's design reflects the culmination of a multi-year effort to study and craft the most effective tolling program that will reduce congestion in the CBD and generate funding to support the MTA's capital needs. *See Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644, 2024 WL 3251732, at *4-7 (S.D.N.Y. June 20, 2024). Many of the findings of those studies are captured in the Program's Final Environmental Assessment ("EA") and Finding of No Significant Impact, which helped to inform the TMRB's recommended toll rates, and which contain much of the data underlying the rationales and benefits that TANY challenges (or simply ignores) in its Complaint. Although the Complaint explicitly incorporates the TMRB's report containing those recommendations, *see supra* n.1, it does not take into account the studies that serve as the basis for the rate schedule finding that trucks have disproportionate impacts on congestion, the environment, and human health. *See, e.g.*, EA at 60, 602.[4]

---

[2] Citations to "TBTA at _" are to pages of the adopted toll rate schedule, available at https://new.mta.info/document/138931, which is incorporated by reference in the Complaint. *See, e.g.*, ¶¶ 5-8, 33.

[3] Citations to "TMRB at _" are to pages of the Traffic Mobility Review Board's ("TMRB's") Report, available at https://new.mta.info/document/127761, which is incorporated by reference in the Complaint. *See, e.g.*, ¶¶ 32-37.

[4] Citations to "EA at _" are to pages of the EA, available at https://new.mta.info/document/111101, which is both integral to and fairly implicated by the Complaint. *See, e.g.*, ¶¶ 32-37, 50-54, 59.

### II.     Dormant Commerce Clause/Right to Travel

TANY's first and second claims allege that the Program violates the dormant commerce clause and the right to travel. *Compare* ¶¶ 76-85, *with* ¶¶ 86-92. In the Second Circuit, challenges to roadway tolls under the dormant commerce clause and the right to travel are evaluated using a three-part test, which asks whether the tolls: (1) are based on a fair approximation of use or privilege for use; (2) are not excessive in comparison with the governmental benefit conferred; and (3) do not discriminate against interstate commerce. *See Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 369 (1994); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 96 (2d Cir. 2009) ("*Selevan I*"). While TANY asserts that the Program's truck tolls fail factors one and two, *see* ¶¶ 76-85, that is not the case.

With respect to the first factor, the Second Circuit has consistently held that tolls charging different rates to different classes of motorists satisfy the "fair approximation" requirement provided that the different rates reflect "rational distinctions among different classes of motorists" tied to the use of a specific roadway by a class of motorists, as well as other common-sense justifications, such as concerns about a toll's burden on certain populations. *See Selevan I*, 584 F.3d at 98; *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 259 (2d Cir. 2013) (per curiam) ("*Selevan II*"). Although use may be "one rational basis upon which to draw 'distinctions among different classes of motorists,' it need not be the only one." *Id*. at 259 n.5. A tolling authority's core obligation is to draw distinctions based on "reasonableness and broad proportionality." *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 340 (S.D.N.Y. 2013).

The Program's toll rates for trucks fall well within these parameters. The truck toll rates reflect rational distinctions. Trucks tend to be larger, take up more space on the road, and engage in more disruptive parking patterns than passenger vehicles. *See* TMRB at 20. Simply put, a truck contributes more to congestion than a passenger vehicle, so the Program rationally will charge trucks more than passenger vehicles to enter the CBD. Moreover, trucks have a disproportionate impact on the environment, emitting more greenhouse gases and more pollutants harmful to human health than the average car (not only because they are larger, but also because most trucks have diesel engines emitting greater amounts of harmful pollutants). *See* EA at 602.

Turning to the second factor, the key question is whether the Program's toll rates for trucks are "excessive in relation to the benefits conferred" on the toll payers. *Selevan II*, 711 F.3d at 260. "Reasonableness" is the touchstone for this inquiry. *Id*. Here, the Complaint alleges that truckers will not see *any* benefits from the Program's operation, reasoning that truckers cannot take advantage of the public transportation options that will be funded by toll payments. ¶ 11. But courts have consistently held that using toll revenues to fund a metropolitan area's public transportation network materially benefits *all motorists* by diverting travelers to mass transit thereby reducing congestion. *See, e.g.*, *Janes v. Triborough Bridge & Tunnel Auth.*, 774 F.3d 1052, 1055 n.6 (2d Cir. 2014); *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 569 (S.D.N.Y. 2014). Here, the EA concluded that truckers will

benefit in the form of faster delivery times, more curbside parking, fewer parking tickets, travel-time savings, and travel-reliability improvements, ultimately leading to higher productivity and lower labor costs. *See* EA at 602.

### III.     F4A Preemption

The Complaint also alleges that the Program "is preempted by federal statute"—namely the F4A—because it is "intended to have" and its "implementation will have a significant effect on the prices, routes and/or services of TANY trucks." ¶¶ 94-97. To the best of our knowledge, no court has ever held that a tolling program is preempted by the F4A and for good reason.

Congress' objective in enacting the F4A was to combat states' "direct substitution of [their] own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 263 (2013). Under the statute, "a State [or] political subdivision of a State . . . may not enact or enforce a law . . . related to a price, route, or service of . . . any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The statutory text then enumerates several explicit *exceptions* to such preemption—one of which provides that the F4A "shall not restrict," among other things, "the safety regulatory authority of a State with respect to motor vehicles, [or] the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle . . . ." *Id.* § 14501(c)(2)(A).

Tolling programs are "far removed from Congress' driving concern" in enacting the F4A. *Dan's City*, 569 U.S. at 263. Charging vehicles for their use of certain roads (regardless of whether they are involved in the transportation of property) does not target motor carriers' prices, routes, or services, and is categorically different from the type of government-mandated distortion of the competitive market that the F4A was intended to prevent. The conclusion that the F4A has nothing to do with the Program is buttressed by the absence of any indication that Congress intended the F4A to preempt tolling programs at all.[5]

The Program is also covered by the F4A's exception for controls based on vehicle size or weight. As alleged, the Program would charge "[t]rucks . . . a $24 or $36 toll (*depending on size*)," ¶ 33(b) (emphasis added). The Program thus, at a minimum, properly belongs within the statute's preservation of state regulatory powers and beyond the F4A's preemptive reach. *See* 49 U.S.C. § 14501(c)(2)(A); H.R. Rep. No. 103-677, at 85, 1993 WL 440339 (1994) (Conf. Rep.) ("State authority to regulate . . . vehicle size and weight . . . is unchanged since State regulation in those areas is not a price, route or service and thus is unaffected.");

---

[5] Congress has enacted several express restrictions on state tolling programs, including prior to its adoption of the F4A demonstrating that it knew how to preempt such programs when it wanted to do so. Cf. Med. Soc. of State of N.Y. v. Cuomo, 976 F.2d 812, 818 (2d Cir. 1992).

*see also* Amy E. Turner, *Legal Tools for Achieving Low Traffic Zones*, 50 Env'l. L. Rep. (ELI) 10329, 10333 (2020).

Respectfully submitted,

*[signature]*

Roberta Kaplan

cc: Counsel of record