UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                        :

TRUCKING ASSOCIATION OF NEW YORK,     :

                         Plaintiff,       :

                                           :              24-cv-4111 (LJL)

           -v-                     :

                                         :        OPINION AND ORDER

METROPOLITAN TRANSPORTATION AUTHORITY, :
et al.,

                                       :

                       Defendants.   :

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Plaintiff the Trucking Association of New York ("TANY", or "Plaintiff") initiated this case by complaint on May 31, 2024, against defendants the Metropolitan Transportation Authority ("MTA") and the Triborough Bridge and Tunnel Authority ("TBTA") (together, "Defendants"), arguing that the Central Business District Tolling Program ("CBDTP") implemented by Defendants is unconstitutional.  Dkt. No. 14 (the "Complaint").  Letitia James ("James") intervened in the case in her capacity as Attorney General for the State of New York following her dismissal as a defendant on September 20, 2024.  Dkt. No. 58.  The Court previously granted Defendants' motion to dismiss the Complaint on April 17, 2025.  Dkt. No. 101.  Plaintiff submitted its First Amended Complaint ("FAC") on June 13, 2025, pressing two counts that the Court previously dismissed without prejudice.  Dkt. No. 108.  Plaintiff alleges that the CBDTP is unconstitutional because it violates the Commerce Clause and the Supremacy Clause of the United States Constitution.  FAC ¶¶ 127–71.  For the following reasons, the motion to dismiss is granted.

## BACKGROUND

The background of this case is detailed extensively in two of this Court's prior opinions, one denying TANY's motion for a preliminary injunction, and the other granting MTA's motion to dismiss the Complaint. *See Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (*Chan I*); *Chan v. U.S. Dep't of Transp.*, 782 F. Supp. 3d 39 (S.D.N.Y. 2025) (*Chan II*). This opinion is meant to be read as a companion to those earlier opinions. For the purposes of the motion to dismiss, the Court accepts the factual allegations in the FAC as true and recounts the relevant allegations below as necessary.

### I.     Background on the Tolling Program

On April 1, 2019, the New York State Legislature enacted the Traffic Mobility Act ("Act") to address the severe congestion in New York City. N.Y. Veh. & Traf. Law §§ 1701 *et seq.* The Act directed that the TBTA, the Traffic Mobility Review Board ("TMRB") and the New York City Department of Transportation ("NYCDOT") to establish a tolling program for vehicles entering or remaining in the Manhattan Central Business District ("CBD"). N.Y. Veh. & Traf. Law § 1704(2). In addition to tolling vehicles entering into the CBD, the Legislature directed that the program devote funds to improving the mass transit that would provide an alternative to driving and thereby further reduce congestion. The Legislature required that the tolling program provide for "sufficient revenues into the central business district tolling capital lockbox fund . . . necessary to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program." *Id.* § 1704-a(1). The act defined the CBD as "Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connection to West St." *Id.* § 1704(2).

In November of 2023, the TMRB published a final report to the MTA and TBTA recommending toll rates, credits, discounts, and exceptions to be implemented under the Act. FAC ¶ 39; *see* Traffic Mobility Review Board, *Congestion Pricing in New York* (2023) ("TMRB Report").[1]  The TMRB Report stated that "we have been guided by the groundbreaking legislation that mandated Congestion Pricing in New York City, as well as by the comprehensive National Environmental Policy Act [ ] process culminating in the Final Environmental Assessment [ ] and Finding of No Significant Impact."  TMRB Report at 4.  It also stated that the TMRB's work was "informed by thousands of comments and feedback received from the public at hearings and outreach sessions and through online portals" and that "[w]e have paid particular attention to the impact of the program on environmental justice communities, people with disabilities, and other vulnerable groups."  *Id.* at 5.

The TMRB found that in 2018, for-hire vehicles and taxis made up 52% of vehicle traffic in the CBD, other automobiles and motorcycles made up 35%, commercial vans represented 5%, and trucks and buses each made up 4%.  *Id.* at 11.  It found that the "vast majority of those who drive to the CBD have access to transit" including commuter rail, urban rail, and express bus options.  *Id.*  The TMRB Report stated also that the present traffic conditions cost "businesses, commuters, and residents a staggering $20 billion a year" and threaten public health by "increasing air and noise pollution and increasing emergency vehicle response times."  *Id.* at 6. To ameliorate those effects, the TMRB recommended the following tolling structure:

- Passenger vehicles and passenger-type vehicles with commercial license plates should be charged a $15 toll for entering the CBD, no more than once per day.
- Trucks should be charged a $24 or $36 toll for entering the CBD, depending on their size, as defined below.

---

[1] The TMRB report is expressly incorporated into the FAC by reference.  *See* FAC ¶ 39 n. 1.  It is available at https://www.mta.info/document/127761 (last accessed March 9, 2025).

- Buses providing transit or commuter services should be exempted from the toll.  Other buses should be charged a $24 or $36 toll for entering the CBD, depending on their type, as defined below.[2]
- Motorcycles should be charged half the passenger vehicle toll, no more than once per day.
- Tolls should be charged to vehicles only as they enter the CBD—not if they remain in or leave the zone.
- Congestion toll rates should apply during the most congested times of the day—from 5am to 9pm on weekdays, and from 9am to 9pm on weekends. Toll rates should be 75% lower in the nighttime.
- A credit against the daytime CBD toll rate should be provided to vehicles entering through the four tolled entries that lead directly into the CBD: the Queens-Midtown, Hugh L. Carey, Holland, and Lincoln Tunnels.  The credit should be $5 for passenger vehicles, $2.50 for motorcycles, $12 for small trucks and intercity/charter buses, and $20 for large trucks and tour buses.  No crossing credits should be in effect in the nighttime period when toll rates are 75% lower.
- NYC Taxi and Limousine Commission[ ]-licensed taxis and For-Hire Vehicles ["FHVs"] should be exempted from the daily system toll on vehicles.  Instead, a per-ride CBD toll should be added to each paid passenger trip fare for rides made to, from, or within the CBD at the toll rate of $1.25 per-ride for taxis and $2.50 per-ride for app-based FHVs.
- Specialized government vehicles should be exempted from the CBD toll (in addition to emergency vehicles and vehicles transporting people with disabilities, as required by law).
- Low-income vehicle owners who qualify and register with TBTA should receive a 50% discount on the daytime auto toll after the first 10 trips made by that vehicle in a calendar month.

*Id.* at 8.  The TMRB stated that the proposed toll structure "prioritizes keeping the base toll as low as possible, avoiding unnecessary traffic diversions, supporting equity goals and environmental justice, and keeping the Program simple, easy to understand, and easy to administer."  *Id.* at 7.  Preliminary traffic models showed that the toll structure would result in an

---

[2] The report clarifies that transit and commuter buses, whether they are owned by a public agency or private company under contract with a governmental entity to provide commuter services, should be exempt.  *Id.* at 11.  Other "Intercity and charter buses" were recommended to pay a toll of $24, and "tour buses" a toll of $36.  It reasoned that because "Commuter buses are accessible to the general public," "follow a fixed route," and "service predominantly one direction," they should be exempt.  *Id.*  Intercity buses, by contrast, "do not serve commuters on a daily basis," and tour buses "don't serve a quasi-public transit role," and "should be charged $36 for the disproportionate congestion they cause in the CBD."  *Id.*

estimated 17% fewer vehicles entering the CBD and 9% fewer vehicle miles being driven in the CBD.  *Id.* at 16.

Important here, the TMRB recommended a rate of $24 for small trucks (approximately 1.6 times the automobile rate) and $36 for large trucks (approximately 2.4 times the automobile rate) because "[a]lthough trucks make up only 4% of vehicles in the CBD, they have an outsized impact on congestion, because of their large size and large turning radii, their parking patterns, and the noise and air pollution they cause."  *Id.* (citing New York City Department of Transportation, Miovision Vehicle Classification Data (2018)).  The TMRB explained that those "recommended truck tolls balance the need to encourage the optimization of deliveries, thereby reducing trucks' contribution to congestion in the zone, with the equal need to minimize unnecessary diversions through communities that may already be burdened with comparatively high levels of air pollution and associated adverse health outcomes."  TMRB Report at 20.

## II.    The Original Complaint and this Court's Preliminary Injunction and Motion to Dismiss Opinions

In its original complaint, Dkt. No. 14 ("Compl."), TANY relied on the TMRB Report and alleged, consistent with that report, that although trucks made up only 4% of vehicles in the CBD, they received the highest toll, and complained that the toll was charged per entry instead of per day.  Compl. ¶¶ 33–35.  In addition, it explained that TANY members move millions of tons of freight in and out of New York City each year, and many trucks enter the CBD multiple times per day in order to make deliveries to customers.  *Id.* ¶¶ 42–48.  The trucks making deliveries in the CBD have no option but to enter the CBD and pay the charges imposed by the CBDTP.  *Id.* ¶ 49.  For those making deliveries outside the CBD but in Manhattan or nearby, often the most efficient route includes using a crossing that incurs a charge under the tolling program.  *Id.* ¶ 60–

67. TANY alleged that the costs on the trucking industry will have "significant economic effects on the tens of thousands of businesses located in the Zone." *Id.* ¶ 73.

The original complaint sought relief on the basis that the Act violated the Commerce Clause and the Supremacy Clause of the Constitution.[3]  On the first, it argued that the CBDTP violated the Commerce Clause because "it imposes a financial burden on TANY trucks which is not a fair approximation of their use of the Central Business District," and is "excessive in relation to the benefit conferred on them."  Compl. ¶¶ 81–82.  And on the second, it argued that the CBDTP was preempted by the Federal Aviation Administration Authorization Act of 1994 (the "F4A"), which prohibits states from enacting laws that have an effect on "prices, routes, or services of motor carriers with respect to the transportation of property."  *Id.* ¶ 95.  The Court twice rejected both arguments, first in denying TANY's motion for a preliminary injunction, and second in granting the Plaintiff's motion to dismiss the Complaint.

## A.    The Preliminary Injunction Opinion

In its preliminary injunction opinion, the Court addressed Plaintiff's Commerce Clause and Supremacy Clause arguments and found that Plaintiff did not have a substantial likelihood of succeeding on the merits as to either count.

### 1.    Commerce Clause

Addressing the Commerce Clause first, the Court explained that the Commerce Clause "contains a dormant aspect that denies the states 'the power to discriminate or burden the interstate flow of articles of commerce.'"  *Chan I*, 2024 WL 5199945, at *12 (quoting *E. Profit Corp. Ltd. v. Strategic Vision US LLC*, 2021 WL 2554631, at *22 (S.D.N.Y. June 22, 2021)).

---

[3] Although it also contained a cause of action based on TANY members' right to travel, Compl. ¶¶ 86–92, because that cause of action was previously dismissed with prejudice, the Court does not address it further here.

Relevant here, a user fee, such as a toll, *see id.* at \*14 ("The Tolling Program operates as a user fee"), is reasonable and will not run afoul of the Dormant Commerce Clause "if it (1) is based on some fair approximation of the facilities' use, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 369 (1994) (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17 (1972)); *accord Selevan v. N.Y. Thruway Auth.* ("*Selevan I*"), 584 F.3d 82, 96 (2d Cir. 2009). TANY argued that "the Tolling Program's charges to TANY trucks are not based on a fair approximation of their use." *Chan I*, 2024 WL 5199945, at \*12. The fair approximate use standard is a lenient one, and public facility fees will be found to be fairly approximated so long as they are not "wholly unreasonable." *Evansville*, 405 U.S. at 718. The Second Circuit has instructed district courts considering fair approximation of use to assess whether the "policy at issue reflects 'rational distinctions among different classes of' motorists using the [roadway]." *Selevan I*, 584 F.3d at 98 (citation omitted); *see Selevan v. N.Y. Thruway Auth.* ("*Selevan II*"), 711 F.3d 253, 259 (2d Cir. 2013). "The fair approximation test 'does not require a perfect fit;' 'it simply requires reasonableness.'" *Chan I*, 2024 WL 5199945, at \*17 (quoting *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 339 (S.D.N.Y. 2013)).

The Court concluded that "[t]he Tolling Program readily passes the fair approximation test," because "[t]here are rational reasons for the distinctions it draws." *Id.* at \*18. As the TMRB report found, "[a]lthough trucks make up only 4% of vehicles in the CBD, they have an outsized impact on congestion, because of their large size and large turning radii, their parking patterns, and the noise and air pollution they cause." *Id.* (quoting TMRB Report at 20). Moreover, TANY did not "offer any evidence disputing that finding." *Id.* "The higher toll on

trucks thus rationally reflects this greater use of New York's transportation infrastructure and contribution to deleterious environmental outcomes." *Id.* Additionally, the Court determined that "[t]he frequency of the truck toll is also rational and permissible." *Id.* That is,

> Under the Phase-In Tolling Structure, trucks pay an amount tagged to their use of the city's transportation system; a truck that enters the CBD multiple times per day contributes to congestion more than one that does not. And because trucks represent an oversized contribution to congestion, TMRB Report at 20, charging trucks more for those multiple entries is not a wholly unreasonable distinction between vehicle classes. The frequency of the toll does not have any impact on interstate commerce beyond the higher aggregate cost it requires a re-entering truck to pay. There is no constitutional significance between a toll charged multiple times per day and a higher toll charged once a day with a rebate for those who enter only once. The impact to interstate commerce would be the same under both tolls.

*Id.*

Nor did the Court find it to be important, as TANY alleged, that TANY trucks made up only 4% of CBD traffic, as "the Second Circuit has already held that percentage use is not the lynchpin when determining whether differing rates represent a fair approximation of use for different classes of motorists." *Id.* at *19 (citing *Selevan I*, 584 F.3d at 97.). The "use" of a facility is not measured alone by the number of trucks that enter the CBD but by the use to which they put the CBD relative to other types of vehicles. "Vehicles of different classes each using the tolled system the identical number of times can impose disproportionate costs and derive disparate benefits from that system. A municipality can rationally take those differences into account." *Id.* And TANY provided no "evidence that the TMRB's findings are so inaccurate as to provide a wholly unreasonable basis for the differential toll rates." *Id.* at *21. TANY had argued specifically that the toll rate for trucks was not reasonable because taxis and other for-hire vehicles, which make up 52% of traffic in the CBD, were exempt from the tolls. As the Court explained, that argument was incorrect. While those vehicles are exempt from the "once per day" toll imposed on other automobiles, they pay for cost of entry into the CBD by a per trip toll

assessed on the "for-hire" vehicles' passengers.  Although "for-hire" vehicles do not themselves

pay the toll (but rather their customers do), that was a distinction without a difference.  The toll is

passed on to passengers because, as the TMRB explained, it is "[u]ltimately" the passenger, "not

the driver," who "make[s] the choice to add to vehicle congestion in the CBD."  *Id.*

In sum, the Court determined that the toll charged to trucks was based on their fair

approximate use of the relevant facilities, and that the distinctions drawn between trucks and the

other categories was reasonable and reflected rational distinctions among different classes.

### 2.    Supremacy Clause

TANY also sought a preliminary injunction on the basis that the Act violated the

Supremacy Clause of the U.S. Constitution, as it is preempted by the F4A.  That act contains an

express preemption clause, which states that:

> [A] State, political subdivision of a State, or political authority of 2 or more States
> may not enact or enforce a law, regulation, or other provision having the force and
> effect of law related to a price, route, or service of any motor carrier . . . or any
> motor private carrier, broker, or freight forwarder with respect to the transportation
> of property.

49 U.S.C. § 14501(c)(1).  "Under the Supremacy Clause of the Constitution, state and local laws

that conflict with federal law are 'without effect.'"  *N.Y. SMSA Ltd. P'ship v. Town of*

*Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76

(2008)).  "Where, as in this case, Congress has superseded state legislation by statute, [the

Court's] task is to 'identify the domain expressly pre-empted.'"  *Dan's City Used Cars, Inc. v.*

*Pelkey*, 569 U.S. 251, 260 (2013) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541

(2001)).  A court's reading of an express preemption clause "does not occur in a contextual

vacuum."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Drawing upon the text, structure, and history of the statute, the Court determined that the

F4A did not preempt New York's ability to implement the Act.  The F4A was enacted "to create

a completely level playing field between air carriers and motor carriers." *Chan I*, 2024 WL 5199945, at *28 (quoting *N.Y. State Motor Truck Ass'n v. Pataki*, 2004 WL 2937803, at *5 (S.D.N.Y. Dec. 17, 2004)).  The Court explained that "the relevant inquiry as to whether a law has a significant effect on carrier prices, routes, or services," such that the law would be preempted under the F4A, "is whether the state law at issue (1) 'applies to all businesses or whether it focuses on motor carriers;' (2) addresses the carrier's relationship with its customers or addresses another relationship such as the carrier's relationship with its employees; (3) 'binds the carrier to provide a particular price, route, or service;' and (4) risks creating 'patchwork' of differing state 'service-determining laws.'" *Id.* at *31 (quoting *Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 823 (3d Cir. 2019)).

Applying that framework to the CBDTP, the Court determined that TANY "has not shown that the Tolling Program will have a significant impact on the prices, services, or routes of motor carriers." *Id.*  Looking first to factor 1, the Court found that the CBDTP applies to "multiple classes of vehicles," but "impose[s] a higher fare on trucks than on many other vehicle classes." *Id.* at *32.  However, "[e]ven targeted laws . . . are not necessarily preempted," as that is a "nondispositive factor in determining whether a law has a direct effect on motor carriers' prices, routes, or services." *Id.* (quoting *Bedoya*, 914 F.3d at 821).  On the second factor, the Court found it clear that the CBDTP is "not aimed at the customer-carrier relationship," as "background regulations that are several steps removed from prices . . . are not preempted, even if employers must factor those provisions into their decisions about the prices they set, the routes that they use, or the services that they provide." *Id.* (quoting *Ditts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014)).  Moreover, the Court found that "even if TANY did offer evidence that the Tolling Program would increase the costs of its members doing business in the

CBD, the Tolling Program does not prescribe or proscribe any specific price, route or service. And any incidental effect on the prices that motor carriers choose to offer does not implicate the primary concern underlying the [F4A]—it does not threaten competition between motor carriers." *Id.*

As to the third, and most important, factor, the Court held that "the Tolling Program does not bind motor carriers to undertake any particular service or route or charge a certain price, nor bar the provision of any identified service, route, or price that they might wish to provide." *Id.* at *33. As TANY acknowledged in its declarations before the Court, it is "other considerations (such as customer needs and workforce constraints) that will require the trucks to maintain their current routes and pick-up and delivery hours." *Id.* Finally, on the fourth factor, the Court held that the CBDTP "does not impermissibly threaten a 'patchwork of service-determining laws, rules, and regulations' that requires motor carriers to alter their conduct as they move from jurisdiction to jurisdiction." *Id.* at *34 (quoting *City of New York v. FedEx Ground Package Sys., Inc.*, 2017 WL 740067, at *8 (S.D.N.Y. Feb. 21, 2017)). "The fact that laws may differ from state to state is not, on its own, cause for [F4A] preemption." *Id.* (quoting *Dilts*, 769 F.3d at 647). "Courts generally consider these laws that operate as to resource inputs without constraining the provision of specific services too disconnected from the rates, services, or prices of motor carriers to create the legal patchwork [F4A] preemption was intended to avoid." *Id.*

"Ultimately, because the Tolling Program does not significantly relate to the rate, route, or service of motor carriers, TANY has not demonstrated a likelihood of success on the merits with respect to its claim that the Tolling Program is preempted by the [F4A]." *Id.* at *35.[4]

---

[4] The Court agreed with the Defendants too that even if preemption applied, the CBDTP's treatment of TANY trucks would be saved by the exception to that provision that preserves "the authority of a State to impose highway route controls or limitations based on the size or weight

### B.    The Motion to Dismiss Opinion

Following the preliminary injunction opinion, the Court next addressed TANY's allegations in connection with Defendants' motion to dismiss TANY's Complaint.  The Court rejected again TANY's argument in Count I of the Complaint that "the Tolling Program irrationally distinguishes between classes of vehicles because the Tolling Program charges trucks a high toll per entry into the Manhattan CBD whereas certain other vehicle classes are charged lower amounts and only once per day."  *Chan II*, 782 F. Supp. 3d at 77.  Reiterating its earlier conclusion, the Court again stated that "[i]t is not irrational for the Project Sponsors to determine that cars and other small vehicles should not have to pay as much as trucks."  *Id.*

TANY argued first that the cause of action should not be dismissed because under the Second Circuit's decision in *Selevan II*, the Second Circuit upheld a toll on a bridge that drew a distinction between residents of an isolated island, who would "need to use the bridge and pay the toll several times a day, and other motorists using the bridge."  *Id.* (quoting *Selvan II*, 711 F.3d at 259).  The court explained that TANY's argument was "flaw[ed]" for several reasons.  First, it presumed that "there is something inherent in the nature of trucks that would have them enter the CBD more times a day than cars, taxies," etc., whereas that fact was "hardly self-evident," and had no basis in their complaint.  *Id.* at 78.  "More importantly," in *Selevan II*, the Second Circuit "disavowed the proposition that frequency-based discounts were obligatory," noting that "[w]hile the usage of the Grand Island Bridge might be one rational basis upon which to draw distinctions among different classes of motorists, it need not be the only one."  *Id.* (quoting *Selevan II*, 711 F.3d at 259 n.5).

---

of the motor vehicle."  49 U.S.C. § 14501(c)(2)(A).  *See Chan I*, 2024 WL 5199945 at *35–37.

TANY also argued once more that the toll was not a fair approximate use because trucks made up only 4% of vehicle traffic in the CBD.  Again echoing its earlier decision, the Court held that "the Project Sponsors could rationally have concluded that each truck takes up more space on the road—and thus 'uses' the facility and contributes more to congestion—than a smaller passenger car, that trucks would benefit disproportionately from reduced traffic in the CBD, and that therefore passenger cars, taxis, and motorcycles should not be charged at the same rate and in the same form as trucks."  *Id.* at 79.

As to the Defendants' motion to dismiss Plaintiff's cause of action under the Supremacy Clause, the Court explained that "the legal conclusion that the [F4A] does not preempt the Tolling Program" stood "independently" from "certain references to the factual record" made in the preliminary injunction opinion.  *Id.* at 65.  And "TANY alleges nothing about the Tolling Program, as applied, that could permit a different outcome."  *Id.* at 66.

The Court therefore dismissed Counts I and III without prejudice.

## III.     The First Amended Complaint

Plaintiff filed the FAC following the Court's decision on the motion to dismiss.  The FAC adds few new allegations.  First, the FAC adds several paragraphs regarding the distinctions that the Act draws between trucks and other vehicles.  FAC ¶¶ 6–19.  But the allegations it adds all describe the CBDTP and were contained in the TMRB Report or the toll schedule.  They were all considered by the Court in connection with the preliminary injunction and motion to dismiss opinions.  Those allegations describe the fact that taxis and for-hire vehicles are charged a fee that is passed on to their customers, *id.* ¶ 9, that "[a]lmost all" vehicles are charged only once a day, *id.* ¶ 10, that only commercial trucks and vans and chartered buses must pay a toll for each entry, *id.* ¶ 11, and that these vehicles face the largest burden, *id.* ¶ 13.  The FAC reiterates the allegations made in the Complaint that the trucks have "no choice but to enter and re-enter the

Zone as many times per day as required to meet their customer needs," *id.* ¶ 14, and that the revenue generated will not benefit the trucks, *id.* ¶ 16. *Compare* Complaint ¶¶ 10–11 (containing similar allegations).

Second, the FAC adds allegations that the CBDTP was paused by New York Governor Hochul in June 2024, after it was approved and before it was implemented. FAC ¶¶ 49–54. The FAC notes as well that "[n]othing was done to change the pricing structure [of the CBDTP after the pause] and, in fact, the exact same pricing structure, phased in over the course of 6 years, went into effect on January 5, 2025." FAC ¶ 54. Although the pause occurred after TANY submitted its original complaint, the Court addressed it in the motion to dismiss opinion, as the pause had by that point come and gone. *See Chan II*, 782 F. Supp. 3d at 59.

Third, the FAC adds several pages of allegations regarding TANY's requests for documents from the state agencies under the New York Freedom of Information Law ("FOIL"). FAC ¶¶ 89–126. The FOIL requests are at issue in a distinct proceeding in New York state court. *See Trucking Ass'n of N.Y. v. MTA*, Index No. 157623/2025 (Sup. Ct., N.Y. Cnty. June 13, 2025). The Court has no jurisdiction over the FOIL proceedings, nor has TANY argued as much. It therefore has no authority to enter any relief with respect to the FOIL requests. Because those distinct proceedings have no bearing on the present lawsuit, the Court does not address them further.[5]

## PROCEDURAL HISTORY

This case was initiated by TANY against the MTA, TBTA, and James on May 31, 2024. Dkt. No. 14.[6] At the same time it filed the instant suit, TANY submitted a motion for a

---

[5] In the FAC, Plaintiff has also rewritten the paragraphs under the two causes of action.
[6] Per a later joint stipulation, James was dismissed and intervened in the lawsuit "for the purpose of addressing the constitutionality of the Traffic Mobility Act." Dkt. No. 58 at 2.

preliminary injunction on the basis that the CBDTP violated the Commerce Clause, violated

TANY members' right to travel, and was preempted by the F4A.  Dkt. No. 4.  Defendants

opposed the motion, and the Court held oral argument on December 20, 2024.  Minute Entry of

December 20, 2024.  On December 23, 2024, the Court issued its opinion and order denying

TANY's motion for a preliminary injunction.  Dkt. No. 98; *see Chan I*, 2024 WL 5199945, at

*49.

       Defendants filed a motion to dismiss all counts in the Complaint on September 30, 2024.

Dkt. No. 62.  They were joined also by James.  Dkt. No. 60.  Plaintiff opposed the motions to

dismiss, Dkt. No. 76, to which Defendants replied, Dkt. No. 80.  On April 17, 2025, the Court

issued its opinion and order dismissing the Complaint in its entirety.  Dkt. No. 101; *see Chan II*,

782 F. Supp. 3d at 108–09.  It dismissed Counts One and Three (the fair approximate use and

Supremacy Clause counts) without prejudice and Count Two (the right to travel count) with

prejudice.  *Id.*  Plaintiff filed the FAC re-alleging the Commerce Clause and Supremacy Clause

counts on June 13, 2025.  Dkt. No. 108.  Defendants again moved to dismiss the Complaint, Dkt.

No. 114, joined by James, Dkt. No. 116.  Plaintiff opposed the motion to dismiss, Dkt. No. 121,

to which Defendants and James replied, Dkt. Nos. 122–23.

## LEGAL STANDARD

       To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of

the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement."  *Twombly*, 550 U.S. at 555.  The ultimate question is whether "[a] claim has

facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; see also *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011). In deciding the motion, the Court may consider "documents upon which the plaintiff relies in bringing suit, which are integral to the complaint, and as to which they had notice." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020).

## DISCUSSION

The present motion to dismiss reaches the Court in an interesting posture. Although the Court dismissed the relevant counts without prejudice and Plaintiff submitted an amended pleading, the FAC contains no relevant additional facts beyond those already considered by the Court in both the preliminary injunction and motion to dismiss opinions. "The mere filing of an Amended Complaint does not entitle [a] [p]laintiff to relitigate his claims absent new factual allegations." *Perlman v. General Electric*, 2024 WL 664968, at *5 (S.D.N.Y. Feb. 16, 2024) (quoting *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015). That is because "[u]nder the law of the case doctrine, a court is 'loathe to revisit an earlier decision in the absence of extraordinary circumstances.'" *Id.* (quoting *N. River Ins. Co. v. Phila. Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995)); *see also, e.g., Chavez v. Gutwein*, 2022 WL 1487781, at *7 (S.D.N.Y. May 11, 2022) (same); *In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *3 (S.D.N.Y. Mar. 31, 2022), *aff'd in part, vacated in part on other grounds*, 128 F.4th 26 (2d

Cir. 2025) (same); *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 2015 WL 4460859, at *5 (S.D.N.Y. July 21, 2015) (same).

"The law of the case doctrine, although not biding, 'counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent or compelling reasons,' including *inter alia,* 'the need to correct a clear error or prevent manifest injustice.'" *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (quoting *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008)); *see Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2022) (the law of the case "merely expresses the practice of courts generally to refuse to reopen what has been decided."). Such "cogent and compelling" reasons to reconsider a prior legal conclusion may also include "an intervening change in the law," or the "availability of new evidence." *Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)); *see Klaper v. Cypress Hills Cemetary*, 2014 WL 1343449, at *4 (E.D.N.Y. Mar. 31, 2014). "The purpose of the doctrine is to promote finality and efficiency of the judicial process by 'protecting the agitation of settled issues.'" *Freeman v. Deebs-Elkenaney*, 2025 WL 3493747, at *2 (S.D.N.Y. Dec. 5, 2025) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)); *see Chan Ah Wah v. HSBC N. Am. Holdings Inc.*, 2019 WL 859042, at *4 (S.D.N.Y. Feb. 22, 2019) (the law of the case doctrine is "driven by considerations" that include "judicial economy."). A reviewing Court must "apply the law of the case doctrine to recurring issues that do not involve new factual allegations." *Shanda Games*, 2022 WL 992794, at *3.

It is of course true that where there are "new claims or factual allegations that arguably address the deficiencies the Court previously identified," the Court "will consider those claims anew." *Network Apps, LLC v. AT&T Mobility LLC*, 778 F. Supp. 3d 610, 619 (S.D.N.Y. 2025)

(quoting *Weslowski*, 96 F. Supp. 3d at 316).  But where that is not true, "the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case." *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999); *see Arizona v. California*, 460 U.S. 605, 618 (1983).  Put differently, where the Court has already made a conclusive legal determination with respect to certain allegations, the mere fact that the party contesting a motion to dismiss has re-asserted the same allegations does not entitle them to reconsideration—and absent any intervening legal change or clear error identified in the Court's earlier analysis, the law of the case doctrine indicates that a Court should, for the purposes of judicial efficiency and finality, incorporate its prior legal determinations.  The doctrine is addressed to the Court's "good sense." *Higgins v. Cal. Prune & Apricot Growers, Inc.*, 3 F.2d 896 (2d Cir. 1924) (L. Hand, J.).

As detailed in the background section, this case presents exactly the scenario envisioned whereby "good sense" dictates that a Court not expend unnecessary judicial resources answering the same question of law on the same facts where it has done so before.  The Court extensively addressed TANY's pleadings with respect to fair approximate use and the Supremacy Clause in both its preliminary injunction and motion to dismiss opinions.  Although it presents the same causes of action now in an amended pleading, the FAC does not contain any relevant new factual allegations.  In its briefing in response to the present motion to dismiss, TANY points out that its new complaint is 171 paragraphs, whereas the prior complaint was only 99 paragraphs.  Dkt. No. 121 at 11.  But the mere addition of paragraphs does not speak to the content of those paragraphs.  As explained, fourteen of those new paragraphs expand upon information that was already in the original complaint or the TMRB report incorporated therein by reference, FAC ¶¶ 6–19; others contain merely summations or legal conclusion, *id.* ¶¶ 38, 43, 88; six pertain to

the pause in the CBDTP by Governor Hochul in mid-2024, *id.* ¶¶ 49–54; and thirty-eight concern

the ongoing FOIL litigation, *id.* ¶¶ 89–126.  TANY has amended too the paragraphs of its

complaint under Count I and Count II, but those contain summations of the previously alleged

facts and legal arguments, not new facts.  *Id.* ¶¶ 127–67.[7]

It is self-evident that the information from the TMRB report, which was already included

in the original complaint, will not sustain the amended pleadings.  The Court addressed those

allegations at length in its two earlier opinions.  TANY itself does not explain why Governor

Hochul's pause in the program would aid it in stating a claim under either the Commerce Clause

or the Supremacy Clause.  It states that the pause effected no change in the program.  FAC ¶ 54.

If the CBDTP was lawful before the pause, it was lawful after the pause, as the Court already

concluded in the motion to dismiss opinion.  And although TANY argues that the FOIL litigation

is relevant because it is a "direct reflection of MTA's willful effort to prevent TANY from

obtaining data and information that it is entitled to, and which is reasonably expected to support

TANY's claims," Dkt. No. 121 at 12, the FAC must be judged on the allegations it contains and

not on those that TANY hopes that it would contain.  *See Alonzo v. Chase Manhattan Bank,*

*N.A.*, 25 F. Supp. 2d 455, 457 (S.D.N.Y. 1998) ("In determining the sufficiency of the complaint,

consideration is limited to the factual allegations it contains."); *GMH Capital Partners v. Fitts*,

2025 WL 950674, at *10 (S.D.N.Y. Mar. 28, 2025) ("[A] complaint based on speculation alone

does not state a claim.") (quoting *La Russo v. St. George's Sch. Of Med.*, 936 F. Supp. 2d 288,

305 (S.D.N.Y. 2013).  In any event, TANY does not identify any facts that it expects to discover

that would make a difference in the Court's prior rulings.

---

[7] The allegations under Count I contain a reference to a CBS news report that "reported that data shows traffic has increased in the congestion zone" as of May 2025.  *Id.* ¶ 148–49.  That fact does not go to TANY's Commerce Clause or Supremacy Clause causes of action.

The deficiencies in the FAC are apparent too in considering what it does not allege. In the Court's motion to dismiss opinion, it noted that TANY does not "advance any factual allegations that would support a conclusion that" distinguishing between cars and trucks for the purposes of the toll amount and frequency "[is] wholly unreasonable." *Chan II*, 782 F. Supp. 3d at 77. Other than citing the TMRB report again, Plaintiff advances no such factual allegations in its FAC either. Nor has TANY provided, as the Court noted in its prior opinion, facts that "would call into question the rationality" of treating a truck differently than a car on the basis that they "take up more space on the roads" and "impose greater costs on the integrated transportation system within the CBD." *Id.* And although the Court previously explained that TANY had not included any allegations that would "provide any basis for the Court to infer" that trucks must enter the CBD multiple times a day with such frequency "as to swamp the daily incidence of residents and commuters driving passenger cars into the CBD," *id.* at 78, TANY does not include such allegations here. On the Supremacy Clause, the Court explained in its motion to dismiss opinion that TANY "alleges nothing about the Tolling Program, as applied," that would mandate that trucks take specific routes, or that they have no alternative other than subjecting their fleets to the charges imposed. *Id.* at 66. In the FAC, Plaintiff has added no new allegations making it plausible that the CBDTP proscribes a "specific price, route, or service" that the trucks could offer. *Id.*

Nor does TANY argue that there has been an intervening change in law, or any other "cogent and compelling" reasons for the Court to revisit its prior decisions. *In re Peters*, 642 F.3d at 386. Instead, the Plaintiff retreads the exact same arguments it previously pressed before this Court, on the exact same facts, with no acknowledgement thereof. On the Commerce Clause, TANY repeats its argument that the CBDTP is illegal because (1) trucks make up only

4% of vehicle traffic but have the highest toll; (2) taxis and FHVs are treated much more favorably; and (3) that truck drivers have no choice but to enter the CBD multiple times a day and are the only category required to pay a fee each time.  Dkt. No. 121 at 14–15.  Each of these arguments was extensively considered and rejected by the Court.  *See Chan II*, 782 F. Supp. 3d at 76–79.  And on the Supremacy Clause, TANY presses again its argument that because the CBDTP interferes with motor carriers' routes and services, it is preempted by the F4A.  Dkt. No. 121 at 19–21.  Again, the Court explained previously that the CBDTP is *not* "aimed at the customer-carrier relationship" and therefore is not preempted.  *Chan II*, 782 F. Supp. 3d at 66.

Without new relevant factual allegations, any intervening change in law, or any other showing of clear error or other compelling reason for reconsideration, the Court incorporates the legal conclusions it reached in *Chan I* and *Chan II*.  On that basis, the Defendants' motion to dismiss is granted, as TANY has failed to state a claim for relief under either the Commerce Clause or the Supremacy Clause of the U.S. Constitution.  Because TANY was previously granted leave to amend its Complaint to state an actionable claim and was unable to do so, this dismissal is with prejudice as to both counts.  *See Belikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner that would survive dismissal, opportunity to replead is rightfully denied."); *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 69 (2d Cir. 1998); *Hudson v. Nat'l Football League Mgmt. Council*, 2020 WL 1547467, at *8 (S.D.N.Y. Mar. 31, 2020) (where plaintiff "failed to remedy the deficiencies the Court identified in his original complaint," and the Court previously granted "leave to replead," the court concluded that "repleading would be futile.").

## CONCLUSION

The motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to close

Dkt. Nos. 114 and 116, and to close the case.


SO ORDERED.


Dated: March 10, 2026
    New York, New York                   _____
                                       LEWIS J. LIMAN
                           United States District Judge